**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
MARTINSBURG**

**JOHN C. HENDERSON, JR.**,

      Plaintiff,

**v.**                                        **CIVIL ACTION NO. 3:11-CV-20
(BAILEY)**

**METLIFE BANK, N.A., et al.**,

      Defendants.

**<u>MEMORANDUM OPINION AND ORDER</u>**

Currently pending before this Court are Defendant Edward J. Fitzgerald's Motion to Dismiss for Lack of Personal Jurisdiction [Doc. 9], filed April 20, 2011; Defendant Edward J. Fitzgerald's Motion to Strike [Doc. 30], filed May 10, 2011; and the plaintiff's Motion for Leave to File Surreply [Doc. 31], filed May 10, 2011. The plaintiff responded to the motion to dismiss on April 28, 2011 [Doc. 15], and the defendant replied on May 5, 2011 [Doc. 24]. The Court has reviewed the record and the arguments of the parties and, for the reasons set out below, concludes that the motion to dismiss should be **GRANTED**, the motion for leave should be **GRANTED**, and the motion to strike should be **DENIED**.

**<u>BACKGROUND</u>**

**I.**     **<u>Factual Allegations</u>**

This case arises out of a Virginia loan officer's alleged misuse of funds received from a then-Washington, D.C. resident to cover settlement costs on a home located in Berkeley Springs, Morgan County, West Virginia. In 2004, a mutual friend introduced the plaintiff to Edward J. Fitzgerald, who at that time worked for a mortgage broker named First Horizon.

1

([Doc. 3] at ¶ 1).  At the meeting, Mr. Fitzgerald reviewed the plaintiff's tax documents and prequalified the plaintiff for a mortgage in the approximate amount of $500,000.00, though no loan was consummated.  (Id.).  The plaintiff did not have any further dealings with Mr. Fitzgerald until September 2009.  (Id. at ¶ 2).

In September 2009, the plaintiff and his partner, Thomas Langan ("Langan"), began to look for real estate in West Virginia.  (Id. at ¶ 3).  The same mutual friend arranged another meeting with Mr. Fitzgerald.  (Id.).  At Mr. Fitzgerald's request, the meeting took place at the plaintiff's then-residence, located in Washington, D.C.  (Id. at ¶ 4).  Mr. Fitzgerald, then manager of the Alexandria, Virginia branch of MetLife Home Loans, a division of MetLife Bank, N.A. ("MetLife") again reviewed the plaintiff's tax documents for purposes of prequalification.  (Id.).  By letter dated October 2, 2009, and signed by Mr. Fitzgerald as manager, MetLife prequalified the plaintiff for a mortgage loan in the amount of $245,000.00.  (Id.; [Doc. 3-1]).

Shortly thereafter, the plaintiff and Langan began searching for a residence near Berkeley Springs, West Virginia, and decided to make an offer on one in December 2009.  (Id. at ¶ 5).  Before making the offer, the plaintiff contacted Mr. Fitzgerald who instructed him to send the contract to MetLife immediately after ratification; however, the plaintiff's offer was not accepted.  (Id.).

In March 2010, the plaintiff contacted Mr. Fitzgerald at his MetLife office and indicated his intention to make an offer on another Berkeley Springs property.  (Id. at ¶ 6).  Mr. Fitzgerald confirmed that MetLife's prequalification letter was still valid.  (Id.).  This time, the plaintiff's offer was accepted.  (Id. at ¶ 7).  On March 10, 2010, the plaintiff and Langan signed a contract to purchase a residence located at 93 Native Hemlock Way, Berkeley

Springs, West Virginia 25411. (Id.). The closing was scheduled for April 23, 2010. (Id.). Over the next six weeks, the plaintiff had a number of discussions regarding routine closing issues with Mr. Fitzgerald on his MetLife office phone and his cell phone. (Id.) In addition, the plaintiff and Mr. Fitzgerald corresponded by mail and e-mail regarding various documentation and information needed for the MetLife loan approval. (Id.).

On March 22, 2010, the plaintiff and Mr. Fitzgerald had a conversation about the choice of a title company and the transfer of funds for the down payment and closing costs ("settlement costs"). (Id. at ¶ 8). Mr. Fitzgerald "strongly recommended" M&R Title, Inc., a title company located in Alexandria, because of Mr. Fitzgerald's good relationship with the company and because MetLife needed to know that the funds were, in fact, in escrow and ready for closing. (Id.). Under duress and feeling that using M&R Title was a prerequisite for MetLife's loan approval, the plaintiff agreed. (Id.).

On March 23, 2010, Mr. Fitzgerald called and informed the plaintiff that he would be in Washington, D.C. the next day and wanted to personally pick up a check for settlement costs and deliver it directly to M&R Title to place in their escrow account. (Id. at ¶ 9). On March 24, 2010, Mr. Fitzgerald came by the plaintiff's residence to pick up the check. (Id.). While there, Mr. Fitzgerald suggested that the plaintiff liquidate an Ameriprise stock mutual fund as soon as possible because "the stock market was about to take a beating based on special information he had received." (Id. at ¶ 10). Mr. Fitzgerald further advised the plaintiff that he should place all of the proceeds in escrow with M&R Title until Mr. Fitzgerald could assist the plaintiff in reinvesting the proceeds in another real estate investment. (Id.). The plaintiff agreed to do so in the near future, believing that Mr. Fitzgerald's advice was given in his capacity as a MetLife manager. (Id.). Again, the

3

plaintiff felt pressured that failure to accept Mr. Fitzgerald's advice could jeopardize the approval of his loan.  (Id.).

At the same meeting, Mr. Fitzgerald inquired about other assets the plaintiff and Langan had that were not invested.  (Id. at ¶ 11).  The plaintiff informed Mr. Fitzgerald that he also had an additional $10,000.00 in cash.  (Id.).  Mr. Fitzgerald advised that the cash should also be placed into escrow with M&R Title because if the plaintiff deposited the cash into his bank account, the bank would be required to report the deposit to the Internal Revenue Service which would then commence an investigation of the plaintiff.  (Id.).  The plaintiff agreed and gave Mr. Fitzgerald the $10,000.00 in cash and a check paid to the order of M&R Title in the amount of $140,000.00 with "downpayment" in the memo line ("Settlement Funds").  (Id. at ¶ 12).  The reverse side of the check indicates that it was deposited by M&R Title into its Operating Account No. 2612653.  (Id.).

In early April 2010, the plaintiff's Berkeley Springs-based real estate agent, Sharon Palmeri ("Palmeri"), inquired as to the plaintiff's preference for a settlement and title company.  (Id. at ¶ 13).  The plaintiff replied that Mr. Fitzgerald had pressured him to use M&R Title.  (Id.).  Palmeri told the plaintiff he should not feel pressured and suggested that he consider a title company located in Berkeley Springs.  (Id.).  Shortly thereafter, the plaintiff selected Trump and Trump, LC, located in downtown Berkeley Springs.  (Id.). When informed the following day, Mr. Fitzgerald became angry and stated that it was a big mistake because no one would be at the closing to properly represent the plaintiff's interests.  (Id. at ¶ 14).  Mr. Fitzgerald stated that he or a MetLife associate named "Michelle" had planned to attend the closing to "look after" the plaintiff's interests, but that this would no longer be possible.  (Id.).  Mr. Fitzgerald urged the plaintiff to reconsider.

(Id.).

On April 19, 2010, the plaintiff instructed Ameriprise to close his account and transfer the full amount of the proceeds to his personal bank account at Burke and Herbert in Alexandria. (Id. at ¶ 15). The plaintiff planned on subsequently following Mr. Fitzgerald's instructions and transferring those funds to M&R Title. (Id.).

At 7:00 p.m., on the evening before the April 23, 2010, closing, Mr. Fitzgerald called the plaintiff from his MetLife office and informed him that the Settlement Funds were not available for closing. (Id. at ¶ 16). Specifically, Mr. Fitzgerald stated, "Your money at M&R Title is not here and is not available for you to use at the closing." (Id.). Asked for a clarification, Mr. Fitzgerald stated again, "The money is not at M&R. You are also going to have to find additional funds to close your loan." (Id.). Ignoring the plaintiff's demand for an explanation, Mr. Fitzgerald replied that if the plaintiff wanted to close on his loan and not be in breach of his real estate contract, the plaintiff should meet Mr. Fitzgerald at his Alexandria office the next day at 8:00 a.m. (Id.). Though the closing was scheduled for 11:00 a.m., in Berkeley Springs, two hours from Alexandria, the plaintiff agreed. (Id. at ¶ 17).

On the morning of April 23, 2010, the plaintiff arrived at Mr. Fitzgerald's office on time. (Id. at ¶ 18). Immediately upon arrival, Mr. Fitzgerald informed the plaintiff that he was in danger of not being able to close on his loan because there were no funds for closing. (Id.). When the plaintiff asked about the Settlement Funds he gave him in March, Mr. Fitzgerald replied, "There is nothing to discuss. There was a minor glitch in getting the money, but your money is safe." (Id.). Mr. Fitzgerald then demanded that because Ameriprise had not yet liquidated his mutual fund and sent the proceeds to the plaintiff's

bank, the plaintiff should call Ameriprise immediately and transfer the proceeds from liquidation to M&R Title or the plaintiff "would not be going to closing." (Id. at ¶ 19). Under duress, the plaintiff called Langan who was waiting in the car to come help him decide the best course of action. (Id. at ¶ 20). However, when Langan arrived in Mr. Fitzgerald's office, an assistant prevented him from entering the room where the plaintiff and Mr. Fitzgerald were meeting. (Id.). Langan could not reach the plaintiff on his cell phone during the next hour. (Id.).

Meanwhile, Mr. Fitzgerald continued to pressure the plaintiff, advising him to decrease the amount of his down payment. (Id. at ¶ 21). In particular, Mr. Fitzgerald stated, "Instead of putting down $100,000.00, you need to go as low as you can." (Id.). At the same time, Mr. Fitzgerald threatened the plaintiff that if he failed to liquidate his Ameriprise account and transfer those funds to M&R Title that morning, as well as locate additional funds to close the loan, MetLife would not approve his loan. (Id.). In a panic, the plaintiff called Ameriprise from Mr. Fitzgerald's office and begged them to expedite the transfer. (Id. at ¶ 22). Ameriprise agreed to transfer approximately $135,000.00 to the plaintiff's bank that morning. (Id.). Mr. Fitzgerald then instructed the plaintiff to go transfer those funds from his bank to M&R Title, find another $60,000.00 to close the loan, and come back to his office at MetLife. (Id.). The plaintiff met Langan outside the office, walked a block to his bank, made the transfer, obtained $60,000.00 for the closing, and returned to MetLife, as instructed. (Id. at ¶ 23).

Upon their return, Mr. Fitzgerald said that he had independently confirmed that the transfer to M&R Title had been completed. (Id. at ¶ 24). Because the plaintiff complied with his instructions, Mr. Fitzgerald advised that he would start the closing in his office to

6

be completed in Berkeley Springs. (Id.). Mr. Fitzgerald called someone into the office who brought closing documents for signature. (Id.). Mr. Fitzgerald then instructed the plaintiff to return to his bank to have the documents notarized. (Id.). The plaintiff complied and upon his return to MetLife, Mr. Fitzgerald assembled a package of closing documents for the plaintiff to deliver to Trump and Trump, LC, in Berkeley Springs. (Id.). The plaintiff and Langan arrived in Berkeley Spring at 5:00 p.m., closed the loan, and recorded the deed without incident. (Id.).

Over the next month, the plaintiff called Mr. Fitzgerald at his MetLife office almost daily to ask for the return of all the funds sent to M&R Title. (Id. at ¶ 25). Only when the plaintiff informed Mr. Fitzgerald that he needed the money to pay an outstanding medical bill did Mr. Fitzgerald agree to return a small amount of the funds. (Id.). On June 29, 2010, Mr. Fitzgerald deposited a personal check for $15,000.00 into the plaintiff's bank account; however, the check was subsequently returned due to insufficient funds. (Id.). When contacted, Mr. Fitzgerald explained that his wife must have withdrawn money without his knowledge. (Id.). On July 19, 2009, Mr. Fitzgerald deposited a second check for $15,000.00, which this time cleared. (Id.).

On May 27, 2010, the plaintiff drafted a loan agreement, covering the unreturned funds and making Mr. Fitzgerald liable as debtor, and sent the agreement to Mr. Fitzgerald's MetLife office. (Id. at ¶ 26). When contacted two days later, Mr. Fitzgerald said he had not received the loan agreement and directed the plaintiff not to send anything else to him by e-mail or mail. (Id. at ¶ 27). Instead, Mr. Fitzgerald had his assistant retrieve another copy from the plaintiff the same day. (Id.). However, when contacted on June 10, 2010, Mr. Fitzgerald stated that he had yet to review the loan agreement. (Id. at

¶ 28).

On June 11, 2010, Mr. Fitzgerald called the plaintiff from his cell phone and asked for another copy of the loan agreement because he had just been terminated by MetLife. (Id. at ¶ 29). Mr. Fitzgerald asserted that his former assistant had been working as part of a sting operation on behalf of MetLife, that MetLife had just completed an investigation, and that MetLife was "out to destroy him." (Id.). When the plaintiff asked about his money, Mr. Fitzgerald assured him that the money was safe but warned the plaintiff that if he were not patient, he would get nothing. (Id.).

From July through September 2010, the plaintiff continued his attempts to contact Mr. Fitzgerald several times per week. (Id. at ¶ 30). When reached, Mr. Fitzgerald maintained that he was in constant contact with M&R Title and was attempting to arrange the return of the plaintiff's money. (Id.). Subsequently, the plaintiff retained counsel who contacted counsel for M&R Title to request the return of the plaintiff's money. (Id. at ¶ 31). Counsel for M&R Title represented that an investigation would be initiated but told the plaintiff's counsel that it was in M&R Title's best interest not to further discuss the matter. (Id.).

In January and February 2011, the plaintiff contacted Mr. Fitzgerald several times to demand the return of his money. (Id. at ¶ 32). During one phone conversation, Mr. Fitzgerald admitted that he had taken some of the plaintiff's funds and invested them in oil stock controlled by his sister, Jacqueline Fitzgerald Bradley. (Id.). Mr. Fitzgerald stated that his sister had control over the account and would not given him access or allow him to sell his share to pay back the plaintiff. (Id.). When the plaintiff then informed Mr. Fitzgerald that he would be filing a lawsuit as soon as possible, Mr. Fitzgerald paid the

plaintiff $22,000.00 and asked him not to take legal action.  (Id.).

## II.  <u>Procedural History</u>

On March 11, 2011, the plaintiff filed suit against, *inter alia*, Met Life, M&R Title, and Mr. Fitzgerald in the United States District Court for the Northern District of West Virginia based upon diversity jurisdiction pursuant to 28 U.S.C. § 1332.  The Complaint [Doc. 3] names Mr. Fitzgerald in five causes of action: (Count I) breach of contract, (Count II) negligence, (Count IV) gross negligence, (Count VI) fraud, and (Count VII) conversion.  As relief, the plaintiff seeks actual damages in the amount of $248,000.00 plus interest from the date the plaintiff's funds were converted, punitive damages, a return of all fees and interest paid on the plaintiff's mortgage loan with interest, and attorney's fees and costs.

On April 20, 2011, Mr. Fitzgerald filed the instant Motion to Dismiss for Lack of Personal Jurisdiction [Doc. 9].  Specifically, Mr. Fitzgerald argues that he should be dismissed pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure because he lacks sufficient minimum contacts with the State of West Virginia.  In support of his argument, Mr. Fitzgerald states that: (1) he has never transacted any business in West Virginia, (2) he has never derived substantial revenue from services rendered in West Virginia, (3) he has no interest in real property located in West Virginia, and (4) he has caused no tortious injury by an act committed in West Virginia.  With specific reference to the plaintiff's allegations, Mr. Fitzgerald emphasizes that no alleged tortious act occurred in West Virginia nor were any tortious acts were directed at a West Virginia resident.

On April 28, 2011, the plaintiff filed a Response [Doc. 15], arguing that this Court has personal jurisdiction over Mr. Fitzgerald, who has minimum contacts with the State of West Virginia.  Specifically, the plaintiff argues that Mr. Fitzgerald: (1) facilitated the

consummation of a mortgage loan, which bound a West Virginia resident and which was secured by real property located in West Virginia; (2) directed the transmission of closing documents to a settlement agent in West Virginia; and (3) stood to collect fees and interest for MetLife on the plaintiff's mortgage loan. In addition, the plaintiff argues that Mr. Fitzgerald's acts taken as an agent for MetLife can be used to establish personal jurisdiction because West Virginia does not recognize the fiduciary shield doctrine.

On May 5, 2011, Mr. Fitzgerald filed a Reply [Doc. 24], reiterating and supplement his previous arguments made in support of his motion. In particular, Mr. Fitzgerald argues that **Columbia Briargate Co. v. First Nat'l Bank**, 713 F.2d 1052 (4th Cir. 1983) mandates his dismissal because his alleged tortious actions as an employee of MetLife occurred outside of West Virginia. Mr. Fitzgerald contends that **Columbia Briargate** stands for the proposition that the fiduciary shield doctrine immunizes an agent of a foreign corporation from suit in the forum state when the plaintiff fails to allege that the agent committed a tort there. Thus, because the plaintiff alleges that Mr. Fitzgerald committed torts in Virginia and Washington, D.C., Mr. Fitzgerald argues that the fiduciary shield doctrine mandates his dismissal. In addition, Mr. Fitzgerald denies that he directed harm toward West Virginia or toward a West Virginia resident, insofar as before the closing the plaintiff was a resident of Washington, D.C.

On May 9, 2011, the plaintiff filed a Surreply [Doc. 28], arguing that **Columbia Briargate** does not mandate Mr. Fitzgerald's dismissal. Instead, because the fiduciary shield doctrine is unavailable in West Virginia, the sole issue is whether Mr. Fitzgerald has sufficient minimum contacts with the State. On May 10, 2011, Mr. Fitzgerald moved to strike the plaintiff's Surreply for failure to move for leave [Doc. 30]. Later that day, the

plaintiff moved for leave based upon Mr. Fitzgerald's citation of **Columbia Briargate** as controlling for the first time in his Reply [Doc. 31].

**DISCUSSION**

## I.  Rule 12(b)(2) Standard

Once a defendant challenges personal jurisdiction, the plaintiff bears the burden of producing facts that support the existence of jurisdiction.  *See* **Carefirst of Md., Inc. v. Carefirst Pregnancy Crisis Ctrs., Inc.**, 334 F.3d 390, 396 (4th Cir. 2003) ("When personal jurisdiction is properly challenged under Rule 12(b)(2), the jurisdictional question is to be resolved by the judge, with the burden on the plaintiff.").  Ultimately, plaintiffs must establish personal jurisdiction by a preponderance of the evidence.  **New Wellington Fin. Corp. v. Flagship Resort Dev. Corp.,** 416 F.3d 290, 294 (4th Cir. 2005); **Carefirst of Md., Inc.**, 334 F.3d at 396.  At this stage of the case, however, a plaintiff must establish a prima facie case for the exercise of personal jurisdiction by pointing to affidavits or other relevant evidence.  *See* **New Wellington Fin. Corp.**, 416 F.3d at 294; **Carefirst of Md., Inc.**, 334 F.3d at 396.

A plaintiff must make two showings to establish personal jurisdiction over a non-consenting, non-resident defendant.  First, a plaintiff must show that a statute makes the defendant amenable to process.  *See e.g.,* **Consulting Eng'rs Corp. v. Geometric Ltd.**, 561 F.3d 273, 277 (4th Cir. 2009) ("A federal district court may only exercise personal jurisdiction over a foreign corporation if such jurisdiction is authorized by the long-arm statute of the state in which it sits and application of the long-arm statute is consistent with the due process clause of the Fourteenth Amendment."); *see also* **Int'l Shoe Co. v. Washington**, 326 U.S. 310, 314-15 (1945).  Second, maintenance of the suit in the forum

at issue must be consistent with traditional notions of fair play and substantial justice embodied in the Due Process Clause of the United States Constitution. *Int'l Shoe Co.*, 326 U.S. at 320.

West Virginia's long-arm statute extends to the constitutional maximum permitted by the Due Process Clause. W.Va. Code § 56-3-33; *see also Touchstone Research Lab., Ltd. v. Anchor Equip. Sales, Inc.*, 294 F.Supp.2d 823, 827 (N.D. W.Va. 2003). Thus, in West Virginia, the issue of personal jurisdiction is simple: whether the exercise of personal jurisdiction would comport with the Due Process Clause. *See Williams v. Adver. Sex LLC*, 2007 WL 2570182, at *3 (N.D. W.Va. Aug. 31, 2007); *see also Christian Sci. Bd. of Dirs. v. Nolan*, 259 F.3d 209, 215 (4th Cir. 2001). To comport with the Due Process Clause, a plaintiff must demonstrate that: (1) the non-resident "has 'minimum contacts' with the forum" and (2) "requir[ing] the defendant to defend its interests in that state 'does not offend traditional notions of fair play and substantial justice.'" *Carefirst of Md., Inc.*, 334 F.3d at 397 (quoting *Int'l Shoe*, 326 at 316); *see also Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474-77 (1985).

## II.  Analysis

### A.  Motion to Strike / Motion for Leave to File Surreply

As outlined above, the plaintiff filed a Surreply without first moving the Court for leave. The next day, Mr. Fitzgerald moved to strike the Surreply, causing the plaintiff to move for leave to cure his procedural deficiency. In support of leave, the plaintiff argues that Mr. Fitzgerald's citation of *Columbia Briargate* as dispositive for the first time in his Reply necessitated a response disputing the significance Mr. Fitzgerald placed on the case.

Upon careful consideration of the above, this Court finds that the plaintiff has shown

good cause for leave to file his Surreply.  Accordingly, the plaintiff's Motion for Leave to File Surreply **[Doc. 31]** should be **GRANTED**, and Mr. Fitzgerald's Motion to Strike **[Doc. 30]** should be **DENIED**.[1]

## B.      12(b)(2) Motion

Mr. Fitzgerald states three bases in support of his 12(b)(2) motion, namely that: (1) the fiduciary shield doctrine mandates his dismissal, (2) he has insufficient minimum contacts with West Virginia, and (3) exercising jurisdiction over him in West Virginia fails to comport with traditional notions of fair play and substantial justice.  The Court will consider each basis, in turn.

### 1.      Fiduciary Shield Doctrine

In his Reply, Mr. Fitzgerald argues that the fiduciary shield doctrine, as applied in *Columbia Briargate Co. v. First Nat'l Bank*, 713 F.2d 1052 (4th Cir. 1983), mandates his dismissal as a foreign corporation's agent who the plaintiff fails to allege committed a tort in West Virginia.  This Court disagrees.

In *Charter Communs. VI, LLC v. Eleazer*, 398 F.Supp.2d 502, 505 (S.D. W.Va. 2005), the Honorable David A. Faber explained the insignificance, or even irrelevance, of the fiduciary shield doctrine in the personal jurisdiction analysis of a West Virginia court, as follows:

> It is clear that under federal law, the status of a defendant as an employee of a corporation alleged to have acted improperly does not shield him from personal jurisdiction.  *See **Calder v. Jones***, 465 U.S. 783, 790 (1984); *see also **ePlus Tech., Inc. v. Aboud***, 313 F.3d 166, 177 (4th Cir. 2002).  Rather, "[e]ach defendant's contacts with the forum State must be assessed

---

[1]However, this Court cautions counsel for the plaintiff to hereafter comply with the Local Rules of Civil Procedure, including Rule 7.02(b)(3).

individually." *Calder*, 465 U.S. at 790. In the Fourth Circuit, to the extent that a forum state's long-arm statute is "coextensive with the full reach of due process," fiduciary shield documents like the one alleged by Eleazer are unavailable. *See* ***Pittsburgh Terminal Corp. v. Mid Allegheny Corp.***, 831 F.2d 522, 525 (4th Cir. 1987). As West Virginia's long-arm statute, found at W.Va. Code § 56-3-33, is co-extensive with the full range of due process, insofar as defendant Eleazer purports to be protected by a fiduciary shield, such argument fails. "[T]he controlling issue is simply whether the non-resident defendant, whatever role he may have occupied, had . . . 'minimum contacts.'" ***Columbia Briargate Co. v. First Nat'l Bank of Dallas***, 713 F.2d 1052, 1064 (4th Cir. 1983).

*See also* ***AARP v. Am. Family Prepaid Legal Corp., Inc.***, 604 F.Supp.2d 785, 799 (M.D.N.C. 2009) ("A corporate officer who actively participates in a tort may be liable even if he or she was acting in a corporate capacity.").

As Judge Faber explained, quoting ***Columbia Briargate***, the controlling issue in the instant case is whether Mr. Fitzgerald, "whatever role he may have occupied," has minimum contacts with the State of West Virginia. Whether Mr. Fitzgerald committed a tort within West Virginia will be considered in this Court's minimum contacts analysis, not as dispositive of the entire personal jurisdiction question.

### 2. Minimum Contacts

In response to Mr. Fitzgerald's motion, the plaintiff appears to rely upon two contacts by Mr. Fitzgerald with the State of West Virginia to support personal jurisdiction. First, the plaintiff argues that Mr. Fitzgerald facilitated the consummation of a mortgage loan secured by real property located in West Virginia. Second, the plaintiff argues that Mr. Fitzgerald caused tortious injury in West Virginia by acts taken outside of West Virginia. The Court will consider the sufficiency of each contact, in turn.

### i. Interest in Forum Real Property

In arguing that MetLife's security interest in real property located in West Virginia,

14

alone, supports exercising jurisdiction over Mr. Fitzgerald, the plaintiff relies upon ***Johnson v. Long Beach Mortgage Loan Trust 2001-4***, 451 F. Supp.2d 16 (D. D.C. 2006). However, because ***Johnson*** is distinguishable from the instant case, this Court finds that MetLife's security interest does not constitute a sufficient minimum contact with the State of West Virginia for purposes of exercising jurisdiction over Mr. Fitzgerald.

The sole issue presented in ***Johnson*** was whether the district court could "exercise personal jurisdiction over a non-resident defendant trust company that has no contacts with [the forum state] other than taking assignment of a mortgage note secured by real property [in the forum state], *where the note and rights to the property are the sources of controversy in this case*[.]" ***Johnson***, 451 F. Supp. 2d at 27. The court in ***Johnson*** found the security interest sufficient because the plaintiff "[sought] to hold the Trust liable, as an assignee, *for wrongdoing in connection with the allegedly invalid creation of the security interest*." ***Id.*** at 22. In other words, the plaintiff in ***Johnson*** sought to challenge the *validity* of the non-resident defendant's security interest.

By contrast, the plaintiff in the instant case seeks to recover funds transferred to a title company before his closing, and thus, prior to the creation of the security interest in forum state real property. *See* ***Skinner v. Preferred Credit***, 361 N.C. 114, 126, 638 S.E.2d 203, 213 (2006) (finding that a security interest failed to satisfy the minimum contacts prong of a personal jurisdiction analysis because, unlike ***Johnson***, the case concerned a dispute over whether origination fees paid at closing were usurious). In fact, at no point does the plaintiff challenge the validity of MetLife's security interest in forum state real property. Accordingly, that contact, by itself, cannot provide a basis to exercise personal jurisdiction over Mr. Fitzgerald.

### ii.    Causing Tortious Injury in Forum by Act Outside Forum

In Counts VI and VII, the plaintiff alleges that Mr. Fitzgerald is liable to him for fraud and conversion, respectively, and provides an affidavit accompanying his Response to support the assertion that Mr. Fitzgerald directed his tortious conduct toward the plaintiff who Mr. Fitzgerald knew was relocating to West Virginia.

"In dealing with a tort allegation, 'a court may exercise specific personal jurisdiction over a non-resident defendant acting outside of the forum when the defendant has intentionally directed his tortious conduct toward the forum state, knowing that that conduct would cause harm to a forum resident.' *Carefirst of Md. Inc. v. Carefirst Pregnancy Ctrs., Inc.*, 334 F.3d 390, 397-98 (4th Cir. 2003) (discussing the holding in *Calder v. Jones*, 465 U.S. 783 (1984)).  This is referred to as the 'effects test' and 'is typically construed to require that the plaintiff establish that: (1) the defendant committed an intentional tort; (2) the plaintiff felt the brunt of the harm in the forum, such that the forum can be said to be the focal point of the harm; and (3) the defendant expressly aimed his tortious conduct at the forum, such that the forum can be said to be the focal point of the tortious activity.' *Id.* at 398 n. 7 (citing *IMO Indus., Inc. v. Kiekert AG*, 155 F.3d 254, 265-66 (3d Cir. 1988))." *Hanson & Morgan Livestock, Inc. v. B4 Cattle Co., Inc.*, 2008 WL 4066251, *4 (S.D. W.Va. Aug. 27, 2008).  This three-prong test, articulated by the United States Court of Appeals for the Fourth Circuit, represents a "restrictive" interpretation of *Calder* and the effects test.  *See Billiter v. Kellogg, Brown & Root Servs., Inc.*, 2010 WL 2901618, *13 (N.D. W.Va. July 21, 2010) (citing *ESAB Group, Inc. v. Centricut*, 126 F.3d 617, 625-26 (4th Cir. 1997)).  Below, this Court will apply the effects test accordingly.

The first element is satisfied because fraud, like conversion, is an intentional tort.

16

*See* **Baker v. Wheat First Sec.**, 643 F.Supp. 1420, 1431 (S.D. W.Va. 1986). As a matter of law, however, only the fraud claim can survive the second element because "[t]he legal injury occasioned by the tort of conversion is deemed to occur where the actual conversion takes place." **United States v. Swiss Am. Bank, Ltd.**, 191 F.3d 30, 37 (1st Cir. 1999) (citing **Cycles, Ltd. v. W.J. Digby, Inc.**, 889 F.2d 612, 619 (5th Cir. 1989)). By the plaintiff's own allegations, his funds were converted in Virginia, not West Virginia. (See [Doc. 3] at ¶ 64). In contrast, the plaintiff alleges that Mr. Fitzgerald's fraudulent representations, which led to the conversion of his funds, caused him injury in West Virginia to the extent that the plaintiff's inability to use the Settlement Funds prevented him from making a higher down payment at the closing conducted in West Virginia. (See Id. at ¶¶ 57, 60; [Doc. 15-1] at 8). Even assuming this means the "brunt of the harm" caused by Mr. Fitzgerald's fraudulent representations occurred in West Virginia, this Court finds below that the plaintiff has failed to satisfy the third prong of the effects test.

For the reasons that follow, this Court concludes that the plaintiff has failed to sufficiently allege that Mr. Fitzgerald aimed his tortious conduct at West Virginia. First, this Court is unpersuaded by the plaintiff's allegation that Mr. Fitzgerald aimed his tortious conduct at a West Virginia resident because he was aware that the plaintiff intended to reside in West Virginia after his closing. As the Fourth Circuit once cautioned, "jurisdiction [should not] depend on a *plaintiff's* decision about where to establish residence [because] [s]uch a theory would always make jurisdiction appropriate in a plaintiff's home state, for the plaintiff *always* feels the impact of the harm there." **ESAB Group, Inc. v. Centricut, Inc.**, 126 F.3d 617, 625-26 (4th Cir. 1997) (emphasis in original); *see also* **Setra of N. Am., Inc. v. Schar**, 2004 WL 1554195, *8 (M.D.N.C. July 7, 2004) ("Such a rule would radically

alter jurisdictional due process analysis, which heretofore has relied on purposeful activity of a defendant . . ..").  Instead, "[w]hile the place that [a plaintiff] feels an alleged injury is relevant to the jurisdiction inquiry, 'it must ultimately be accompanied by the defendant's own contacts with the state if jurisdiction over the defendant is to be upheld.'" **Billiter**, 2010 WL 2901618, *17 (quoting **ESAB Group**, 126 F.3d at 626).  Here, the plaintiff has failed to allege that his injury was accompanied by Mr. Fitzgerald's own contacts with West Virginia.  In fact, if anything, Mr. Fitzgerald allegedly targeted a resident of Washington, D.C., by using fraudulent representations made there and at his MetLife office in Alexandria, Virginia.  Based upon these allegations, this Court cannot find that West Virginia was the focal point of Mr. Fitzgerald's tortious activity.  Accordingly, this Court finds that the plaintiff has failed to establish minimum contacts sufficient to support the exercise of personal jurisdiction over Mr. Fitzgerald.

### 3.    Fair Play and Substantial Justice

In light of the Court's conclusion above that Mr. Fitzgerald lacks sufficient minimum contacts with the State of West Virginia, this Court must necessarily find that its exercise of jurisdiction over Mr. Fitzgerald would fail to comport with traditional notions of fair play and substantial justice.

### <u>CONCLUSION</u>

For the foregoing reasons, this Court finds that Defendant Edward J. Fitzgerald's Motion to Dismiss for Lack of Personal Jurisdiction **[Doc. 9]** should be, and hereby is, **GRANTED**.  Accordingly, Defendant Edward J. Fitzgerald is hereby **DISMISSED** from the above-styled action.  In addition, this Court finds that the plaintiff's Motion for Leave to File Surreply **[Doc. 31]** should be and hereby is, **GRANTED**.  Finally, this Court finds that

Defendant Edward J. Fitzgerald's Motion to Strike **[Doc. 30]** should be, and hereby is,

**DENIED**.

It is so **ORDERED**.

The Clerk is directed to transmit copies of this Order to all counsel of record herein.

**DATED**: May 18, 2011.

JOHN PRESTON BAILEY
UNITED STATES DISTRICT JUDGE